DEPARTMENT OF THE AIR FORCE
HEADQUARTERS AIR FORCE LEGAL OPERATIONS AGENCY (HQ AFLOA)

19 June 2006

AFLOA/JACN
1501 Wilson Blvd, Room 606
Arlington, VA 22209-2403

Mr. Paul E. Jordan
Procurement Control Group
Office of the General Counsel
U.S. Government Accountability Office
441 G Street N.W.
Washington, D.C. 20548

Re: Protest of East/West Industries, Inc., (B-297391.2)—Submission of Additional Information

Dear Mr. Jordan:

Please find the attached Supplemental Contracting Officer's Statement of Facts ("COSSOF") and Declaration from James Lobnow in response to your request for additional information on the protest of East/West Industries, Inc., (B-297391.2).

The protester attached several e-mails to its Comments on the Agency Report purporting to be evidence of safety problems with Regent's cranes. However, as you can see from the attached declaration and COSSOF, these e-mails discuss mostly minor problems with a few cranes. Additionally, most of the instances were caused by operator error. Further, any problems with the cranes themselves were quickly resolved.

East/West contends that the Air Force should have done more to investigate alleged safety problems with Regent's cranes. (Protester Comments at 6). However, East/West has clearly been conducting an exhaustive search for such information and has failed to present any compelling evidence that it exists. The Air Force was not required, by the solicitation or otherwise, to do a more thorough search than the one it performed in this evaluation. Even if the Air Force conducted an exhaustive search there is simply no evidence that it would have found any recurring safety problems with Regent's cranes. For instance, even if the Air Force were required to check with the Air Force Safety Center as a part of this evaluation—which it was not—it would not have found this information. The spreadsheet relied upon by East/West in its protest does not indentify the manufacturers of the cranes that are referenced in that document. The entire "safety" issue, as raised by East/West, is simply a red herring. The instances that East/West has highlighted are minor, relatively low in number given the sheer amount of cranes that Regent has provided to the Air Force over the years, and, for the most part, completely irrelevant to the present solicitation.

East/West also complains that the Air Force should have given it a higher relevancy and overall confidence rating (Protester Comments at 15). However, the contracting officer explains in the attached COSSOF that East/West's three relevant contracts combined for only 130 units. In comparison, the Regent contracts were for a combined 405 units. The solicitation requirement was for 360 units. (COSSOF at 3). Given this discrepancy in the number of cranes produced by the two companies, it was certainly reasonable for the Air Force to assign the rating that it did to East/West.

It is clear from the COSSOF that the contracting officer gave ample consideration to the underlying differences in the offerors' past performance and ultimately decided that Regent offered the best value to the Air Force. (COSSOF at 2-5). The evaluation of past performance, including the agency's determination of relevance and scope of an offeror's performance history to be considered, is a matter of agency discretion that the GAO will not find improper unless unreasonable, or inconsistent with the solicitation criteria or procurement statute or regulation. Family Entm't Servs., Inc., d/b/a/ IMC, B-291997.4, June 10, 2004, 2004 CPD para. 128 at 5.

The bottom line is that the Air Force acted reasonably and consistent with the terms of the solicitation in conducting this evaluation and East/West simply disagrees with the outcome. That does not render the Air Force's evaluation unreasonable. Command Mgmt. Servs., Inc., B-292893.2, June 30, 2004, 2004 CPD para. 168 at 3.

If there are any questions, I can be reached at 703-696-9087 (fax 703-696-9084).

Sincerely

Jeffrey Branstetter, Major, USAF
Trial Attorney, Commercial Litigation Division

Attachments:

1. Contracting Officer's Supplemental Statement of Facts
2. Declaration of James Lobnow

cc:

Phillip M. Dearborn, Esq.
Fax #202-857-0200

Robert A. Brunette, Esq.
Fax #818-502-9078

Supplemental Contracting Officer's Statement of Facts and Findings
Protest to the General Accounting Officer (GAO) After Award

GAO DOCKET NUMBER B-297391-2/3
CONTRACT NUMBER: FA8518-05-D-0003
RFP NUMBER: FA8518-04-R-70801

The following supplemental Statement of Facts and Findings is submitted in response to the protestor's comments on the agency report dated 12 Jun 2006.

The protestor requested copies of the MOCAS reports. (Page 4, Footnote) The MOCAS reports were inadvertently omitted from the Agency Report; however, upon discovery of their omission, they were provided as supplemental documentation on 2 Jun 2006.

The protestor included several documents under Exhibit D of their 12 Jun 2006 letter which they felt indicated continuing problems with the Regent crane. I met with Stephen Gibbs/642 CBSSS/GBZO-ENV, the engineer which initially performed the technical evaluation, to review this documentation. The official notification of problems/issues with any Government equipment is through the Quality Deficiency Report (QDR) system. Whenever the field discovers a discrepancy, necessary paperwork is processed and input into the system. The engineers are alerted to any problems through this process. There are no QDR's on record for the Regent crane. Each document included in Exhibit D is addressed below:

(a) Service Bulletin, Regent Model 9319-0010; Utility Crane, Towable, 3950-01-371-9144
Mr. Gibbs was not familiar with this document; therefore, it was not considered in his evaluation. He is not aware of any QDRs being submitted for this subject matter.

(b) 7 Sep 2001 e-mail to East/West from David Singleton, Langley AFB; Subject - Crane Issues
WR was not included on distribution for this e-mail. Mr. Gibbs was not familiar with this document; therefore, it was not considered in his evaluation.

(c) 4 May 1999 e-mail from Texas ANG; Subject Crane Failure.
Mr. Gibbs was not familiar with this particular e-mail. However, he was aware of the overall general issue of setting screws. He indicated this issue was not attributed to the Regent crane. This is a user issue as a result of failure to follow AFOSH standards. No QDRs were ever issued.

(d) 9 Feb 1998 e-mail; Emergency Command One-Time Inspection of Canopy Crane; Incident at Homestead
Mr. Gibbs was not familiar with this document; therefore, it was not considered in his evaluation. No QDRs were ever issued.

(e) Nov 2001 e-mail from Kenneth Kelley, AGE Program Mgr.
The technical team was aware of the interface problems with the F-16, but was not aware of the crane hitting the hanger pipes. The interface issue is/was not a latent defect. The crane was accepted by the government after passing the compatibility test on 23-24 Feb 1994 (procedures attached.) Demonstration #2 identifies a canopy removal from an F-16 with maintenance stands in place. The crane passed the necessary test.

The following documentation was considered by the reevaluation team in making our determination.

The new evaluation team reviewed the proposals submitted by those offerors in the competitive range at time of award. (3 offerors) A review of the technical report previously issued by the cognizant engineer during the initial evaluation was accomplished. In the initial evaluation, each offeror's technical proposal was evaluated for physical characteristics, system reliability, and system maintainability. Each offeror was to provide a detailed narrative description supported by detailed drawings, pictures, sketches, calculations or other items as required to provide evidence that the offered product would meet the technical and performance requirements called out in the PD. All offerors within the competitive range were determined technically acceptable. Each offeror was next evaluated for risk. In accordance with the solicitation, the proposal risk assessment would assess the risk associated with the offeror's approach as it relates to accomplishing the requirements of the solicitation. A risk assessment was incorporated into the initial technical report and was considered in the reevaluation. After the review of technical acceptability and risk, it was determined that there was no need for additional information for these areas and was integrated into the new evaluation decision. Past and present information was also reviewed. Each offeror provided present and past information on 4 contracts which they considered relevant to the instant effort. Questionnaires were reviewed and data was verified through phone interviews and e-mail correspondence with customers, PCOs, engineers, DCMA, and GSA. Current delivery performance data was retrieved from the MOCAS and PPIRs systems. An Evaluation notice was issued to the offerors on 10 Mar 06 providing the Government's relevancy ratings for each of the 4 submitted contracts as well as the overall confidence assessment. The offerors were given the opportunity to provide any clarifying information which was also considered during the reevaluation. Since several of the relevancy ratings changed, it was necessary to document these changes in a new report. All of the above information was utilized in making an integrated assessment considering each offeror's risk, past and present information, and pricing proposal. The determination was made that Regent offered the best value to the Air Force.

The following additional clarifying information regarding the relevancy ratings is provided in an effort to further explain how we arrived at our ratings. The protestor pointed out specific contracts. The technical complexity and the magnitude of the effort (qty/dollars) for each of these contracts is restated below in comparison to the required solicitation. Additionally, an assessment regarding the aggregate of the submitted contracts in comparison to the required solicitation is provided.

**East/West contract W9133-04-F-0017**

This crane is a non-powered, air-transportable, mobile crane with a lifting capacity of at least 1250 lbs which is what this solicitation requires in terms of technical complexity. However, when assessing the magnitude of the effort against the immediate RFP, this contract involves less magnitude of effort than the required solicitation; therefore, the contract was determined RELEVANT.

57 each $3.9M (contract) versus 360 each $15M (required solicitation)

**East/West contract P.O. 117409**

This crane is non-powered, air-transportable, mobile, and has a lifting capacity of at least 1250 lbs, which is what this solicitation requires in terms of technical complexity. However, when assessing the magnitude of the effort against the immediate RFP, this contract involves much less magnitude of effort than the required solicitation; therefore, the contract was determined SEMI-RELEVANT.

8 each $559,000 (contract) versus 360 each $15M (required solicitation)

**East/West N00421-99-R-1172**

This contract was for the design and production of attenuating troop seats system retrofit kits for the H53E. This contract did not involve the minimum significant aspects of what this solicitation requires: a non-powered, air transportable, mobile crane with lifting capacity. This contract was not used to remove/replace aircraft components, and is not aircraft ground support equipment. Therefore, this effort was determined NOT RELEVANT because it did not involve any significant aspects of the 1500 lb crane effort.

In terms of magnitude and scope, the aggregate of the three relevant efforts submitted by East/West revealed total production quantities of 130 units and a total value of approximately $9M, in comparison to the required solicitation for 360 units with a total estimated value of $15M.

**Regent DTCG38-98-C-J0007**

This effort involved the design and production of an external crane for HH-60 helicopter support. This crane is non-powered, air-transportable, and it has a lifting capacity of at least 750 lbs. However, it is not mobile; therefore, it does not meet the criteria outlined in the solicitation for Very Relevant or Relevant. This effort was for delivery of 9 units and valued at $151,000. Therefore, this effort involved much less magnitude of effort and complexities, including some of what this solicitation requires and is determined SEMI-RELEVANT.

In terms of magnitude and scope, the aggregate of the four relevant efforts submitted by Regent revealed total production quantities of 405 units and a total value of approximately $9M, in comparison to the required solicitation for 360 units with a total estimated value of $15M. Of the efforts submitted by Regent, no more than 2 efforts were on-going simultaneously.

The protestor questioned Rickey Moore's role in the evaluation process. (Page 13) Rickey Moore is an engineer assigned to 542 CSW/SEVSG/GBZO-ENV and was not involved in the initial evaluation. He was brought in during the reevaluation phase to provide technical relevancy ratings only for the past performance contracts submitted. Mr. Moore's input was considered in the overall relevancy determination for each contract.

The protestor points out that the currency and relevancy of the information provided by Regent spans from 4 to 9 years and their contracts are very recent. (Page 16) In accordance with the terms and condition of the solicitation, the performance on efforts identified was restricted to those completed or ongoing during the past ten years from the issuance date of the RFP. The contracts provided by Regent were within the required time frame.

The protestor points out how Regent was third in risk behind Goodcrane and East/West. (Page 21, reference Tab 7 at pg 8) The differing degrees of low risk between the companies was not a consideration in as much as the solicitation did not provide for this differentiation. Risk was to be assessed as Low, Moderate, or High. Our assessment consisted of a review of the technical report previously issued by the cognizant engineer during the initial evaluation. In the initial evaluation, each offeror's technical proposal was evaluated for physical characteristics, system reliability, and system maintainability. All offerors within the competitive range were determined technically acceptable. Each offeror was then evaluated for risk. In accordance with the solicitation, the proposal risk assessment would involve assessing the risk associated with the offeror's approach as it relates to accomplishing the requirements of the solicitation. A risk assessment was incorporated into the initial technical report and was considered in the reevaluation. All offerors were determined Low Risk. Past and present information was reviewed next. Each offeror initially provided present and past information on 4 contracts which they considered relevant to the instant effort. Questionnaires were reviewed, phone interviews were conducted, and e-mail correspondence occurred with customers, PCOs, engineers, DCMA, and GSA in an effort to verify information relative to these contracts. Current delivery performance data was retrieved from the MOCAS and PPIRs systems. An Evaluation notice was issued to the offerors on 10 Mar 06 providing the Government's relevancy ratings for each of the 4 submitted contracts as well as the overall confidence assessment. The offerors were given the opportunity to provide any clarifying information which was also considered during the reevaluation.

East/West, with a very good/significant confidence rating, submitted four efforts for review, one effort was very relevant, one effort was relevant, one effort was semi-relevant and one effort was not relevant. East/West has shown proven and successful experience to manage relatively large quantity contracts over an extended period of time. There were no weaknesses identified in East/West's performance relative to delivery, customer service, Sustainment, maintenance, or the quality of its products. East/West strengths included responsive customer service and quality of products.

Regent, with a very good/significant confidence rating, submitted four efforts for review. One effort was very relevant, and three efforts were semi-relevant. Regent has shown proven and successful abilities to mange "D" type contracts, large dollar and large quantity contracts. There were no weaknesses identified in Regent's performance relative to delivery, customer service, Sustainment, maintenance, or the quality of its products. Regent's strengths included resolving technical issues and customer support.

In summary, East/West, Goodcrane, and Regent were evaluated as being technically acceptable, low risk, meaning their proposal had little potential to cause disruption of schedule, increased cost, or degradation of performance. The preeminent confidence rating of all the proposals belonged to East/West and Regent with a very good/significant confidence rating. Regent's offer of $13,296,510 was the lowest of the three offerors. Regent has had experience with Government contracts that involved the production and delivery of cranes, long ordering periods, and quantities required for this effort. The price that Regent proposed was determined to be reasonable based on adequate price competition and balanced in its line item pricing. Based on the work history of Regent, the Government has a very good/significant confidence that the company will perform the technical, programmatic and logistical requirements of the 1500 lb Portable Egress Crane requirement. Based on the information gathered and documented during the evaluation process, a trade-off between past/present performance and price was not necessary because East/West Industries and Regent were both technically acceptable and assessed with a

very good/significant confidence. Hence, when all factors are equal, the lowest total evaluated price takes precedence, which was offered by Regent.

| | Technical | Risk | Past Performance | Price |
|---|---|---|---|---|
| East/West | Acceptable | Low | Very Good/Significant Confidence | $13,840,000 |
| Goodcrane | Acceptable | Low | Marginal/Little Confidence | $22,023,000 |
| Regent | Acceptable | Low | Very Good/Significant Confidence | $13,296,510 |

Based on the criteria specified in the solicitation and an integrated assessment of the proposals submitted, the determination was made that Regent offered the best value to the Air Force.

Salena W. Arrington

SALENA W. ARRINGTON
Contracting Officer
642 CBSSS/GBZO-PKBB

19 Jun 06

| | | |
|---|---|---|
| REGENT MFG., INC. | DOCUMENT NO. ER 0168<br>DATE OF REV.<br>PAGE NO. | REV. |

APPENDIX B

Compatibility Test Procedures
for SERD 01132
1500 pound Towable Utility Crane

1. Purpose: To document the compatibility of the Regent Model 9319-010 utility crane.

2. Test Procedures: Tests will be conducted by Egress technicians, AGE technicians, and aircraft maintenance personnel.

3. Aircraft: At this time, a Block 42D model with LANTIRN pods, full fuel tanks, internal and external, and any other stores to duplicate a worse case scenario has been requested for the test. Actual Configuration: The F-16 Block 42D model aircraft was available with LANTIRN pods and fuel tanks (internal and external), but amount of fuel was unknown. The strut on the nose landing gear was looked at, and at normal height.

4. Date of Compatibility Test: 23-24 February 1994

5. Place: Nellis AFB, Nevada

A. The following equipment items will be required to perform this demonstration:

| | | |
|---|---|---|
| 1. | SERD 01132. | Utility Crane, Towable. P/N 9319-010 |
| 2. | SERD 12016. | Sling Assembly, Canopy F-16. P/N 16A12016-1 |
| 3. | SERD 12012. | Sling Assembly, Seat Lifting. P/N 16A12012-1 |
| 4. | SERD 75004. | Armament Lug Beam. P/N T1F68D |
| 5. | SERD 01034. | Leading Edge Flap Power Drive Unit. P/N NAS1213R10J92 |
| 6. | SERD 11012. | Sling Assembly, Vertical Tail. P/N 16A11012-1 |
| 7. | SERD 11776. | Wing Box. P/N 16A11776-1 |
| 8. | SERD 14206. | Horizontal Stabilizer. P/N 16A14206-1 |
| 9. | SERD 24041. | EPU - fuel tank hoisting strap. P/N 16A24041-1. |
| 10. | SERD 01007. | Quantity of 2 Type B-4 Maintenance Platforms (or equivalent). P/N 54J6345 |
| 11. | SERD 01009. | Quantity of 2 Type B-1 Maintenance Platforms (or equivalent). P/N 48E16919 |
| 12. | Tow vehicle | |

B. AGE technician will perform the following prior to the compatibility test demonstration:

1. Inspect caster brakes for ease of setting, holding, and releasing.

Comments: The caster brakes were easy to set, hold, and release, but problems were noted with their operation. The F-16 SPO will request the contractor change the style of caster and operation of the caster locking brake, but this will not effect any clearances

noted during the compatibility test. Height will remain the same.

2. Verify if common hardware is used for construction.

Comments: Enginetics provided the user a list of common hand tools required to repair the cranes. No peculiar tools were noted.

3. Verify hook is secured in towing configuration.

Comments: Hook secured easily with no problems noted.

4. Verify no more than two people (possibly one) can easily maneuver to position for towing.

Comments: A female weighing less than 125 pounds maneuvered the crane by herself so it could be hooked up to the tow vehicle. Although the casters will be changed, the caster wheel tread will remain the same, therefore, the rolling resistance should remain the same. No problems were noted.

5. Verify ease of hooking and unhooking crane to tow vehicle.

Comments: No problems were noted.

C. The demonstration will be as follows:

NOTE

Not all aircraft Line Replaceable Units will be removed from the aircraft. During the demonstration, lift slings and adapters will be positioned to the relative location required to perform the applicable maintenance task.

1. Verify crane to remove canopy as follows:

a. Attach canopy sling SERD 12016 (or equivalent) to lift hook on SERD 01132.

b. Position B-4 and/or B-1 maintenance stands (or equivalents), as required to support canopy removal operations.

c. Position SERD 01132 with SERD 12016 over relative position required for canopy removal operation.

d. Remove canopy following T.O. 1F-16()-2-95JG-20-1 procedures.

__X__ PASS ______ FAIL

Comments: Crane was set in the highest position to remove the canopy. No problems were noted.

2. Verify crane to remove aft Ejection Seat as follows:

a. Attach aft ejection seat sling SERD 12012 (or equivalent) to lift hook on SERD 01132.

b. Position B-4 and/or B-1 maintenance stands (or equivalents), as required to support aft ejection seat removal operations.

c. Position SERD 01132 with SERD 12012 over relative position required for aft ejection seat removal operation.

d. Remove aft ejection seat following T.O. 1F-16()-2-95JG-10-1 procedures.

_X_ PASS _____ FAIL

Comments: The ejection seat was not entirely removed from the aircraft, as the seat would have been required to be sent to the egress shop if it was removed from the aircraft. The sling was attached to the seat, and this test was completed by similarity. No problems were noted.

3. Verify crane to install aft Ejection Seat as follows:

a. Attach aft ejection seat sling SERD 12012 (or equivalent) to lift hook on SERD 01132.

b. Position B-4 and/or B-1 maintenance stands (or equivalents), as required to support aft ejection seat installation operations.

c. Position SERD 01132 with SERD 12012 over relative position required for aft ejection seat installation operation.

d. Install aft ejection seat following T.O. 1F-16()-2-95JG-10-1 procedures.

_X_ PASS _____ FAIL

Comments: See note above.

4. Verify crane to install canopy as follows:

a. Attach canopy sling SERD 12016 (or equivalent) to lift hook on SERD 01132.

b. Position B-4 and/or B-1 maintenance stands (or equivalents), as required to support canopy installation operations.

c. Position SERD 01132 with SERD 12016 over relative position required for canopy installation operation.

d. Install canopy following T.O. 1F-16()-2-95JG-20-1 procedures.

X PASS ______ FAIL

Comments: No problems were noted.

5. Verify the crane to the 20mm gun drum access as follows:

a. Attach 20mm gun drum sling SERD 75004 (or equivalent) to lift hook on SERD 01132.

b. Position B-4 and/or B-1 maintenance stands (or equivalents), as required to support 20mm gun drum removal operations.

c. Position SERD 01132 over the relative position required for 20mm gun drum removal operation.

d. Lower crane hook ensuring that the attaching hook will center over the gun drum access panel.

e. Remove SERD 01132 and SERD 75004 from aircraft.

X PASS ______ FAIL

Comments: The gun sling was not available, so the crane was positioned and the hook lowered to simulate reach. No problems were noted.

6. Verify the crane to the Leading Edge Flap (LEF) drive unit access as follows:

a. Attach LEF drive unit sling SERD 01034 (or equivalent) to lift hook on SERD 01132.

b. Position B-4 and/or B-1 maintenance stands (or equivalents), as required to support LEF drive unit removal operations.

c. Position SERD 01132 with SERD 01034 over the relative position required for LEF drive unit removal operation.

d. Ensure that the crane attaching hook will center over LEF drive unit access panel.

e. Remove SERD 01132 and SERD 01034 from aircraft.

__X__ PASS ______ FAIL

Comments: The LEF drive unit sling was not available, so the crane was positioned and the hook lowered to simulate reach. No problems were noted.

7. Verify the crane to Vertical Stabilizer access as follows:

a. Attach vertical stabilizer sling SERD 11012 (or equivalent) to lift hook on SERD 01132.

b. Position B-4 and/or B-1 maintenance stands (or equivalent) as required to support vertical stabilizer removal operation.

c. Position SERD 01132 with SERD 11012 over the relative position required for LEF drive unit removal operation.

d. Ensure that the attach points of the vertical stabilizer sling will properly attach to the aircraft vertical stabilizer.

e. Remove SERD 01132 and SERD 11012 from aircraft.

__X__ PASS ______ FAIL

Comments: The vertical stabilizer sling was not available, so the crane was positioned and the hook lowered to simulate reach. No problems were noted.

8. Verify the crane to Wing Box access as follows:

a. Attach wing box sling SERD 11776 (or equivalent) to lift hook on SERD 01132.

b. Position B-4 and/or B-1 maintenance stands (or equivalent) as required to support wing box removal operation.

c. Position SERD 01132 with SERD 11776 over relative position required for wing box removal operation.

d. Ensure that the attach points of the vertical stabilizer sling will properly attach to the aircraft wing box.

e. Remove SERD 01132 and SERD 11776 from aircraft.

__X__ PASS ______ FAIL

Comments: The wing box sling was not available, so the crane was

positioned and the hook lowered to simulate reach. No problems were noted.

9. Verify the crane to horizontal stabilizer access as follows:

a. Attach horizontal stabilizer sling SERD 14206 (or equivalent) to lift hook on SERD 01132.

b. Position B-4 and/or B-1 maintenance stands (or equivalent) as required to support horizontal stabilizer removal operation.

c. Position SERD 01132 with SERD 14206 over relative position required for horizontal stabilizer removal operation.

d. Ensure that the attach points of the horizontal stabilizer sling will properly attach to the aircraft horizontal stabilizer.

e. Remove SERD 01132 and SERD 14206 from aircraft.

__X__ PASS ______ FAIL

Comments: The horizontal stabilizer sling was not available, so the crane was positioned and hook lowered to simulate reach. No problems were noted.

10. Verify the crane to EPU fuel tank - fuel hoisting strap access as follows:

a. Attach EPU fuel tank sling SERD 24041 (or equivalent) to lift hook on SERD 01132.

b. Position B-4 and/or B-1 maintenance stands (or equivalent) as required to support EPU fuel tank removal operation.

c. Position SERD 01132 with SERD 24041 over relative position required for EPU fuel tank removal operation.

d. Ensure that the attach points of the EPU fuel tank sling will properly attach to the aircraft EPU fuel tank.

e. Remove SERD 01132 and SERD 24041 from aircraft.

__X__ PASS ______ FAIL

Comments: The EPU fuel tank sling was not available, so the crane was positioned and hook lowered to simulate reach. No problems were noted.

NOTE

An aircraft compatibility test checking the interface with the Rapport ECM and Vertical Tail Drag Chute will not be required since these are FMS applications.

NOTE

The following test is to verify that the crane can reach the "worst case scenario" for height on an F-16 A/B aircraft, and verify any close tolerances since this aircraft has the lightweight landing gear.

11. If an F-16 A/B model aircraft is available, verify crane to remove canopy as follows:

a. Attach canopy sling SERD 12016 (or equivalent) to lift hook on SERD 01132.

b. Position B-4 and/or B-1 maintenance stands (or equivalents), as required to support canopy removal operations.

c. Position SERD 01132 with SERD 12016 over relative position required for canopy removal operation.

d. Ensure that the attach points of the canopy sling will properly attach to the aircraft canopy.

e. Remove SERD 01132 and SERD 12016 from aircraft.

_____ PASS _____ FAIL

Comments: An F-16 A/B model aircraft was not available. However, an F-15, A-10, F-4, and T-38 were available. The crane was positioned and checked for clearances and height. No problems were noted.

12. Mobility Tests

a. With the crane in the transport configuration, it shall be towed at speeds not exceeding 10 mph on a level, smooth surface for a distance of approximately 2 miles. Verify that there is no evidence of instability, poor tracking, swerving, tilting, or uncontrollable sideslipping.

__X__ PASS _____ FAIL

Comments: As noted in previous comments, the F-16 SPO will request the contractor change the style of caster and operation of the

caster locking brake, but this will not effect any clearances noted during the compatibility test.

Compatibility Test witnessed by:

M C Walker 24 Feb 94 Regent Manufacturing

24 FEB 94 Enginetics Corp

Air National Guard

HQ ACC/LGMS

HQ ACC/LGMD

# DECLARATION OF JAMES LOBNOW

I, JAMES LOBNOW, declare and say that:

1. I have been the Engineering Manager at Regent Mfg., Inc., Downey, CA ("Regent") since November 1980, and I am the Program Manager for Regent on the 1500 LB MAC Crane contract. My current address is 101 Parrot Avenue, Fountain Valley, CA 92708. I have personal knowledge of the matters set forth herein, and if called as a witness, could and would testify competently to the matters stated herein.

2. I am highly familiar with Regent's Aircraft Jacks, Hoisting and Lifting Devices, and related Ground Support Systems, including their design, development, manufacturing, testing, qualification, operation, maintenance, after-sales Field Service and Training requirements.

3. I reviewed the 1-page 9/7/01 Langley AFB e-mail (from David Singleton to A. Loving of East West Industries), which mentions a 1,500 pound crane and a 6,000 pound crane without identifying their manufacturers. Regent does not manufacture a 6,000 pound crane; which per the e-mail appears to have towbar assembly and castor fatigue failures, but which aren't further described. Regent did, however, manufacture and supply three hundred and sixty 1500 LB Portable Utility Cranes to the Air Force from 1996 to 1999. The e-mail says there are cracks around the welded joints of this Langley AFB crane, but doesn't say there has been a failure of the crane, or identify the cause of the cracks; which could be caused by overloading the crane or other operator misuse of the crane. It also says the hoist cable is fraying and twisting, but gives no particulars. And, it says the winch assembly is "slipping with loads"; which could be caused by a failure to properly lubricate the winch brake bushings every six months, as required in the Air Force's Technical Order T.O. 36C3-6-13-1 for the "Utility Crane, Towable, 1500 LBS (P/N 3950-01-371-9144) Regent Mfg. Inc.,

OPERATION AND MAINTENANCE INSTRUCTIONS MANUAL WITH ILLUSTRATED PARTS BREAKDOWN, ORGANIZATIONAL MAINTENANCE." See Work Package WP 005 00, page 17, Section 8.b (entitled "SERVICING") (excerpt attached to my Declaration).

Regent has never been notified by the U.S. Air Force of any problems with Regent's 1500 LB Crane at Langley AFB. And, I've reviewed the Air Force Safety Center at Kirtland AFB, NM (AFSC) spreadsheet provided in the East/West Industries bid protest and no 9/7/01 Langley AFB incident or mishap is reported there either.

4. I also reviewed the 2-page 5/4/99 Texas Air National Guard e-mail (from Mike Conner to several ANG sites), which mentions that a "Regency Crane cable became dislodged from the attachment point on the cable drum" and "this allowed the end of the cable to dislodge from the drum assembly on the crane" dropping the load (an ejection seat) ten feet from the hangar floor. The ANG identified "the problem was the Setscrew that is in place to hold the cable which allegedly causes "the cable to become unwound at the end, consequently, the setscrew is not effective...".

But, the Regent 1500 LB Utility Crane was never designed to completely unwind the cable from the winch drum and put any stress whatsoever on the set screw, which is only meant to flatten and hold the cable against the winch drum's anchor hole — not to carry a load. In fact, the Air Force's above-referenced T.O. 36C3-6-13-1 Operation And Maintenance Manual specifically requires that when the Regent 1500 LB Utility Crane is assembled on site (by Air Force personnel) that the personnel must "paint a 1-inch red mark on the cable and "a 1-inch non-reflective red line mark on the top of the winch housing adjacent to the cable red line to indicate when the cable has only four (4) wraps left on the drum," so that during operation of the crane, these red lines will serve as an indicator for the user to stop lowering the winch cable." (emphasis added) See Work Package

WP00500, page 17, Section 7.9 (entitled "HOISTING CABLE"), Subsections d. and e. (excerpt attached to my Declaration).

This crane was obviously being operated with a hoist cable too short for safe operation (i.e., when the boom is at maximum height, with the lifting swivel hook on the ground, there's a minimum of four wraps of hoist cable required on the drum for safe operation). So, when the Air Force personnel disassembled the crane for maintenance tasks (see T.O. W.P. 00500, page 4, Sections 2 and 2.1) they must have cut out a section of the cable (due to a kink, or whatever), and after that operated it beyond the red 1-inch safety line (if it was painted as required).

That's probably why the e-mail also strongly recommended "requiring training as an annual requirement" on proper "inspection, set-up and use of the Regency Crane" to help reduce crane failure incidents. This wasn't a Regent Crane failure. It was literally an operator set-up failure — and, the ANG recognized that, but neglected to assess blame on itself in the e-mail. I can sense this from the e-mail's instructions for future crane set-ups to "reposition the cable to have at least 1 to 2 inches of the cable protrude out the other side of the [anchor] hole" — which are the precise set-up instructions in Section 7.9.a of the subject Technical Order (excerpt attached to my Declaration).

Again, Regent was never notified by the ANG of any 1500 Utility Crane set screw/cable problems in 1999 or otherwise. And, the AFSC spread sheet doesn't reference this so-called crane failure in May 1999; so, it wasn't ever identified as a crane mishap — because it was, in truth, simply operator abuse and error.

5. I also reviewed the 5-page 2/9/98 USAF Europe Ramstein Air Base (Germany) e-mail (from Marcelino Martinez to Mario Trevino and others), which first identified a "1500 LB Utility Crane incident" (a boom collapse) at Homestead AFB, FL, and then identified another crane incident (a towbar separated from the main frame) at RAF Lakenheath, U.K., and then detailed a One-Time Inspection (OTI) of all welds of the Regent 1500 LB Utility Cranes at Air Force Bases in

Germany, Italy, Turkey, U.K. and Spain. Again, I'm very familiar with each incident.

Myself and Ken Williams, also of Regent, visited Homestead AFB, FL on March 3, 1998 (shortly after the incident on Feb. 9, 1998) to inspect the Regent's 1500 LB Utility Crane (Serial No. 0060) and any damage. We then gave a written report to Warner Robins Air Logistics Center (WR-ALC) in Georgia. The Air Force agreed that due to the unusual stress damage to the mast lock lugs, the failure was due to Air Force operator misuse of the crane (such as improper towing, overloading of the Crane or similar excessive stresses placed on the hoist).

And, earlier, on January 28, 1998 we were informed by WR-ALC about the RAF Lakenheath U.K. 1500 LB Utility Crane towbar separating from the mainframe of the crane. That was determined to be Regent's manufacturing workmanship error. In other words, the Regent welder initially tack welded the towbar to the crane's main body, and then forgot to perform a full weld, which was then overlooked in the inspection process at our Regent plant, and later by the Air Force's receiving inspectors. The Air Force's OTI inspections in February 1998 Europe on those cranes found no other weld problems — including magnetic particle inspections (IAW 33-B-1-1) of each crane's boom assembly, mast assembly, cable hook pad eyes, pad eyes of the mast lock pin, mast lock pin and the base weldment bracket. It was determined to be a one time weld workmanship error in one crane, one time — not a latent design defect. And, it was quickly investigated and repaired.

The Homestead AFB incident was listed on the AFSC crane mishap spreadsheet as a "mishap", but not the correct operator misuse cause (nor any cause). But, the RAF Lakenheath UK incident is not on the AFSC crane mishap spreadsheet, so it must not have been too serious a concern to the Air Force.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed this 17th day of June, 2006 at Downey, CA.

James R Lobnow

James Lobnow

TECHNICAL MANUAL

# OPERATION AND MAINTENANCE INSTRUCTIONS MANUAL WITH ILLUSTRATED PARTS BREAKDOWN

# ORGANIZATIONAL MAINTENANCE

# UTILITY CRANE, TOWABLE, 1500 LBS

## PART NUMBER 9319-010

## 3950-01-371-9144

REGENT MFG., INC.

F33657-90-D-2184
F09603-94-D-1349
SP0730-96-D-8007
(ATOS)

This publication supersedes Interim Operational Supplement 36C3-6-13-1S-1 dated 24 June 1999.

DISTRIBUTION STATEMENT - Distribution authorized to the Department of Defense and US DoD contractors only (Direct Military Support) (28 January 1995). Other requests for this document should be referred to WR-ALC/LKC, Robins AFB GA 31098. Questions concerning technical content should be referred to WR-ALC/LESGI.

WARNING - This document contains technical data whose export is restricted by the Arms Export Control Act (Title 22, U.S.C., Sec 2751 et seq.) or the Export Administration Act of 1979, as amended (Title 50, U.S.C., App. 2401 et seq.). Violations of these export laws are subject to severe criminal penalties. Disseminate in accordance with provisions of DoD Directive 5230.25.

HANDLING AND DESTRUCTION NOTICE - Comply with distribution statement and destroy by any method that will prevent disclosure of the contents or reconstruction of the document.

Published under authority of the Secretary of the Air Force

BASIC AND ALL CHANGES HAVE BEEN MERGED TO MAKE THIS A COMPLETE PUBLICATION

28 JANUARY 1995

CHANGE 6 - 25 APRIL 2003

## WORK PACKAGE

**MAINTENANCE**

**OPERATION AND MAINTENANCE INSTRUCTION MANUAL**

**WITH ILLUSTRATED PARTS BREAKDOWN**

**UTILITY CRANE, TOWABLE, 1500 LBS**

# LIST OF EFFECTIVE WP PAGES

**Total Number of Pages in this WP is 20**

| Page No. | Change No. | Page No. | Change No. | Page No. | Change No. |
|---|---|---|---|---|---|
| 1 - 2 | 6 | 9 - 10 | 2 | 14.1 - 14.2 | 5 |
| 3 - 4 | 4 | 11 | 0 | 15 | 4 |
| 5 | 3 | 12 | 1 | 16 | 3 |
| 6 | 4 | 13 | 5 | 17 - 18 | 6 |
| 7 - 8 | 0 | 14 | 6 | | |

## TABLE OF CONTENTS


| Paragraph | | Page |
|---|---|---|
| | REFERENCE MATERIAL REQUIRED | 2 |
| | APPLICABLE TCTOs | 2 |
| | CONSUMABLE MATERIALS | 2 |
| | FOREWORD | 2 |
| | SAFETY SUMMARY | 2 |
| 1. | Troubleshooting | 3 |
| 2. | Disassembly | 3 |
| 3. | Cleaning | 13 |
| 4. | Inspection | 13 |
| 5. | Corrosion Prevention | 14 |
| 6. | Repaint | 14 |
| 7. | Assembly | 14 |
| 8. | Servicing | 17 |
| 9. | Operational Checkout | 18 |


## LIST OF ILLUSTRATIONS


| Number | Title | Page |
|---|---|---|
| 1 | Towable Utility Crane | 4 |
| 2 | Boom Assembly | 10 |
| 3 | Mast Assembly | 11 |
| 4 | Winch Assembly | 15 |
| 4A | Disc Brake Assembly | 16 |
| 5 | Winch Brake Bushing Lubrication | 17 |

## REFERENCE MATERIAL REQUIRED

| Publication Number | Publication Title |
|---|---|
| FED-STD-595 | Colors |
| MIL-C-85285 | Coating: Polyurethane, High-solids |
| MIL-M-81807 | Marking of Aircraft Ground Support Equipment and Other Flight Line Vehiles with Retro-Reflective Materials, Process For |
| T.O. 1-1A-15 | General Maintenance Instructions for Support Equipment |
| T.O. 35-1-3 | Corrosion Prevention, Painting and Marking of U.S.A.F. Support Equipment |
| T.O. 35-1-12 | Compounds and Procedures for Cleaning Support Equipment |

## APPLICABLE TCTOs

**None**

## CONSUMABLE MATERIALS

| Nomenclature | Specification or Part No. | CAGE Code |
|---|---|---|
| Grease | MIL-G-10924 | - - - |
| Loctite 242 | MIL-S-46163, Ty II, grade N | 05972 |
| Oil, Lubricating | MIL-PRF-27617 or NSN 9150-01-088-0498 | - - - |
| Paint, Polyurethane, Semi-Gloss Green | MIL-C-85285, Ty II color 24052 | - - - |
| Paint, Polyurethane, Semi-Gloss Black | MIL-C-85285, Ty II color 37038 | - - - |
| Paint, Polyurethane, Semi-Gloss Red | MIL-C-85285, Ty II color 31136 | - - - |
| Paint, Primer | MIL-P-23377 | - - - |
| Ferrule | CL-3-F | 99862 |
| Pin, Cotter | MS9245-45 | 96906 |
| Pin, Cotter (3 ea.) | MS24665-495 | 96906 |
| Pin, Cotter | MS24665-493 | 96906 |
| Pin, Cotter | MS24665-355 | 96906 |
| Ring, Retaining | RS100 | 12437 |

## FOREWORD

This Work Package (WP) contains procedures for maintenance of the crane. It includes safety precautions, troubleshooting, repair, cleaning, inspection, corrosion prevention, lubrication, and testing requirements.

## SAFETY SUMMARY

Observe all safety precautions when performing crane maintenance tasks. Failure to observe safety requirements can result in serious injury and/or damage to requirement.

1. **TROUBLESHOOTING.**

When troubles are evident, refer to WP 004 00, Table 1 for probable causes and recommended actions. After accomplishing corrective procedure, repeat operation or test to verify satisfactory performance.

2. **DISASSEMBLY.**

**WARNING**

Observe all safety precautions when performing crane maintenance tasks. Failure to observe safety precautions can result in serious injury and/or damage to equipment.

**WARNING**

When lifting crane components ensure lifting equipment is of sufficient capacity to support component(s) safely. No maintenance shall be performed while supporting a load. Crane shall be set up only as far as necessary to remove applicable component.

**NOTE**

Disassembly procedures provide for the complete breakdown of all crane components. Complete breakdown is not required for most maintenance actions. Disassemble only to the extent required to remove and replace damaged or defective components.

**NOTE**

Loosely reassemble attaching parts when removed to prevent loss.

**NOTE**

The initial conditions of the crane is assumed to be one where all components are retracted and folded. It may be necessary to manually raise components to access areas for maintenance.

2.1. **Hoisting Cable.**

a. Remove cable weight (2, Figure 1, sheet 2) from hoist cable assembly (6) by removing capscrews (3), lockwashers (4), and nuts (5).

b. Remove swivel hook (7) from latch kit (10) by removing pin (8) and cotter pin (9). Discard cotter pin.

c. Turn winch handle in counterclockwise direction to reel hoist cable off of drum. When cable is fully extended, release from drum by loosening drum setscrew.

2.2. **Spreader Assembly.**

a. Remove spreader assembly (13, Figure 1, sheet 2) from boom assembly (31) by removing capscrews (14), flat washers (15), lockwashers (16), nuts (17), and clamp plate (18).

b. Remove lock pin cables (20) from lock pins (19) and spreader (22) by removing ferrules (21). Discard ferrules.

2.3. **Boom Assembly.**

a. If not already done, disconnect boom positioning cable (8, Figure 2) from base weldment bracket by removing lock pin (2).

b. Remove safety cable assemblies (23, Figure 1, sheet 2) from boom assembly (31) by removing pins (25) and cotter pins (26). Discard cotter pins.

c. Remove safety cable assemblies (23) from mast assembly (34) by removing sleeves (28) and thimbles (29). Discard sleeves.

d. Remove boom pivot pin retaining rings (32) and discard.




*Figure 1. Towable Utility Crane (Sheet 1 of 5)*

b. Mate boom assembly (31) to mast assembly (34) and insert boom pivot pin (33). Secure using new retaining rings (32).

c. Install safety cable assemblies (23) onto mast assembly (34) using new sleeves (29) and thimbles (29).

d. Install safety cable assemblies (23) onto boom assembly (31) using pins (25) and new cotter pins (26).

7.8. **Spreader Assembly.**

a. Install lock pin cables (20, Figure 1, sheet 2) onto lock pins (19) and spreader (22) using new ferrules (21).

b. Install spreader assembly (13) onto boom assembly (31) using capscrews (14), flat washers (15), lockwashers (16), nuts (17), and clamp plate (18).

7.9. **Hoisting Cable.**

a. Hand feed hoist cable over boom sheaves and down to winch drum. Anchor the cable to the winch drum by passing the end of the cable through the anchor hole until a minimum of one inch of cable extends out the other side. Center cable under set screw and use enough force to tighten the set screw until it flattens the cable against the anchor hole. Loctite 222 or 242 or similar low or medium strength thread locker shall be applied to the set screw threads. Refer to T.O. 1-1A-15 or follow the manufacturer's procedures.

**NOTE**

Set screw may be torqued to 12 ft lbs. However, this is not a requirement of the winch manufacturer.

b. Install swivel hook (7) onto latch kit (10) using pin (8) and new cotter pin (9).

c. Install cable weight (2) onto hoist cable (6) using capscrews (3), lockwashers (4), and nuts (5).

d. Paint 1-inch red mark on cable to indicate when cable has only four (4) wraps left on the drum.

e. Paint 1-inch non-reflective red line on the top of the winch housing adjacent to the cable red line. During operation of the crane, these red lines will serve as an indicator for the user to stop lowering the winch cable.

8. **SERVICING.**

a. Brush grease onto winch gear teeth.

**CAUTION**

Do not overlubricate winch brake bushings. Overlubricating may cause oil to leak onto friction discs, which may damage discs or result in poor operation of the brake.

b. Lubricate winch brake bushings every six months. Place one or two drops of gear lubricant into hole in brake housing marked OIL (Figure 5). Turn winch handle through several revolutions to distribute oil on bushings.




*Figure 5. Winch Brake Bushing Lubrication*