IN THE UNITED STATES COURT OF FEDERAL CLAIMS
Bid Protest

| | | |
|---|---|---|
| EAST/WEST INDUSTRIES, INC.,<br>PLAINTIFF<br><br>VS.<br><br>THE UNITED STATES,<br>DEFENDANT<br><br>AND<br><br>REGENT MANUFACTURING, INC.,<br>DEFENDANT-INTERVENER | : | NO. 06-563C<br>(JUDGE FUTEY) |

COPY

WARNER ROBINS, GEORGIA SEPTEMBER 14, 2006 9:50 A.M.

Deposition of TERESA ANN MINTON, Witness, called before Melinda D. Flewellyn, Certified Court Reporter, State of Georgia, Certificate Number B-2307; testimony taken at Comfort Inn, Magnolia Room, 95 S. Highway 247, Warner Robins, Georgia, beginning at approximately 9:50 A.M., September 14, 2006.

*CLAUDE JOINER REPORTING SERVICE, INC.*
*410 AMERICAN FEDERAL BUILDING*
*P. O. BOX 94*
*MACON, GEORGIA 31202-0094*
*TELEPHONE: 478/742-6611 OR 478/746-7804*

through this document and familiarize yourself with it. Tell me when you're ready.

A Okay.

Q Is this what you consider to be the final draft of the source selection decision memorandum?

A I believe it is, without having access to the file to see if there's anything later. But yes, I think so.

Q And this document was sent out -- When was this document sent out?

A September 12th at 1:58.

Q And who sent it out?

A I sent it out.

Q And who did you send it to?

A Joe Hammonds, the program manager; Stephen Gibbs, the engineer; and Gary Moyses, the lead engineer.

Q I noticed that with regard to this document and the two earlier source selection decisions you do not directly cc Elaine Moore. Why is that?

A Before I send anything to Elaine I make sure that the team has seen it. And then if there's anything that they want to add or subtract, I mean, they should, you know, get with me and then we would discuss and see whether it needed to be revised. And that's probably what this was. And once they had all coordinated on it then I would have sent it to Elaine for the final evaluation.

Q Do you recall talking to Elaine at all on September 12th?

A I don't recall. No.

Q Okay. To just kind of cut to the chase on this one, if you'll look at the very last page you'll see that Regent is selected as the best value?

A True.

Q The two earlier source selection decision memorandum that you sent out on September 12th identified East/West. Why did you change from East/West to Regent in the space of an hour?

A Well, I think because I actually had attached the wrong document. I believe, if this has the charts on it -- The charts that were sent with the earlier one did recommend award to Regent. But I had mistakenly attached the prior source selection decision document to that email. When I realized it then I went ahead and resent the correct version. And I think that may have been because with Joe's comment about the relevancy of the International Guard contract. I believe we did change it to very relevant. So I don't know if that was what caused me to realize I had the wrong one or not.

Q If you'll look back at Exhibit 4. You state in the cover page, cover email if you will, that you have highlighted in yellow areas that you know have to be corrected. And those

nothing to do with what she was --

Q Other than those two areas that needed to be changed, you believed Exhibit Number 4 that was being circulated to be accurate and complete, correct?

MR. HARRINGTON: Objection. She testified that the document was not the appropriate attachment and not what she had sent to, intended to send.

Q MR. DEARBORN: Nevertheless, you reviewed this document before you sent it, correct? Which you did testify to?

A No. What I said is that I don't know that I actually read this document before inserting it as an attachment. I had to have read it at some point, yes. But I believe that was the earlier version, and that from that earlier version and from Elaine's comments when we did our evaluation, then the appropriate and the final version was what is in Plaintiff's Exhibit 5. And I just mistakenly attached the wrong one. That's basically what I did on September 12th at 12:33. I said here are the final charts, here is the final source selection decision document. And then I realized, and I don't know what made me realize, but somehow I did attach the wrong source selection decision document. It did not match the briefing charts. When I realized that I sent out the other message at 1:58 with the revised and the final source selection decision document. I

mean, that's from what I understand here that happened.

Q Was Joe Hammonds, Stephen Gibbs, and Gary Moyses aware of the fact that you were changing the awardee selection from Regent to East/West prior to September 12th?

A You mean from East/West to Regent?

Q I'm sorry. From East/West to Regent, yes.

A Yes. They were part of, I mean, we had meetings to discuss it and to go over our evaluation again. Everybody went through again just to evaluate it and make sure that we were covering what we were supposed to. And prior to my preparing this document we did have a final meeting.

Q And did you get any written comments back from Joe, Gary, or Stephen regarding this draft that has the wrong, "wrong" awardee selected in it?

A Are you talking about Exhibit 4?

Q Yes.

A I don't know if I did or not. Maybe that was why I realized I had the wrong one attached. But I don't remember anything in writing. Somebody may have called me up and just said, you know, they're not the same, what's going on. I mean, I just, at this point I don't know. But I do know that we were, once we did the re-evaluation, the team recommended Regent. And that is who we finally, who I awarded to.

Q When you say re-evaluation what are you talking about?

selection documents you'll see that the evaluated results, their past performance didn't change, their risk didn't change. It was the way we were taking that and adding additional information into it that made the first decision. When we realized we couldn't distinguish between risk and we couldn't catagorize anything, with both of them, they had, they remained the same as far as their risk analysis and their past performance from the FPR on. I mean, they, we didn't have any changes there. It was again just information that we were looking at to evaluate. That we were putting in the wrong evaluation.

MR. DEARBORN: Ms. Minton, thank you very much. I appreciate your time. It's still under two hours so we're doing okay.

MR. HARRINGTON: Ms. Minton, before you leave, I actually have a few questions.

MR. DEARBORN: Which may lead to an additional few questions from me.

DIRECT EXAMINATION

BY MR. HARRINGTON:

Q Ms. Minton, was Ms. Elaine Moore involved in the substance of the evaluation that you and your team performed?

MR. DEARBORN: Objection as to the word substance. Undefined, vague.

A THE WITNESS: She was involved in the overall

review. She was also an advisor. If we had questions we could go to her and ask her questions about processes.

Q Did she tell you how to evaluate the technical aspects of the proposals?

A No.

Q Did she tell you how to evaluate the substance of the risks of the proposals?

A Other than just to make sure we were in accordance with the solicitation.

Q Was her role simply one of reviewing your decision and making sure that you abided by the terms of the solicitation?

A Yes.

Q Focusing on Plaintiff's Exhibit 4. Did you attach the wrong copy of the source selection document to Plaintiff's Exhibit 4?

A I believe I did.

Q Before September 12th, had you drafted a source selection document that showed an award to Regent?

A Yes.

Q Could you look at Plaintiff's Exhibit 2? Does that contain a draft source selection document showing an award to Regent?

A Yes.

Q And what was the date of the email on Plaintiff's

Exhibit 2?
A September 6th.
Q You mentioned in your testimony having the chance to raise questions with the technical evaluation team in the course of your work. When would you have had the chance to raise questions with the technical evaluation team?
A At all phases really. They evaluate the proposal, they will give me a report saying whether the contractor has met all parts of the purchase description. If they haven't they will issue evaluation notices to me that I have to review. So if I had any kind of concerns or questions I could have asked at that point. That was prior to the technical acceptability determination.
Q Do you know approximately when the Regent price change occurred?
A I know we had several amendments, and then we had the final proposal revision. And no. I do know it changed but I could not tell you exactly at what point.
Q Have you had any involvement in the award of this contract after September, 2005?
A No.
Q Did you have any involvement in the re-evaluation in 2006?
A No.
Q Do you know what was considered in the re-evaluation

in 2006?

A No.

Q In your opinion, did the evaluation attached to Plaintiff's Exhibit 4 comply with the terms of the solicitation?

A I believe the charts did, but not the source selection decision document.

MR. HARRINGTON: No further questions.

RECROSS-EXAMINATION

BY MR. DEARBORN:

Q I'm sorry, Ms. Minton, but I have a few more. Mr. Harrington asked you whether or not you had received any direction, specific direction from Ms. Moore regarding the technical aspects, and I'm paraphrasing, technical aspects or your technical evaluation of the offerors. And your answer was no. You said that all she told you was that it needed to be redone in accordance with the terms of the solicitation. And I believe that's a quote?

A Yes.

Q And when you say -- So that means you personally made a determination as to what would be in accordance with the terms of the solicitation; is that correct?

A Yes. Once she pointed it out I had to go back and we, that's when we did our second review and made sure that what we were considering was according to the solicitation.